**IN the INTEREST OF A.L.H., a Child**

**NO. 14–16–00556–CV, NO. 14–16–00578–CV**

Court of Appeals of Texas, Houston (14th Dist.).

Opinion filed January 10, 2017

Rehearing Overruled February 14, 2017

Pamela B. Williams, Sarah Regina Guidry, Mani Nezami, Houston, TX, for appellant.

Mark Thomas Zuniga, Sandra D. Hachem, Kali Morgan, Maria Valeria Brock, Houston, TX, John R. Millard, Sugar Land, TX, for appellee.

Panel consists of Justices Boyce, Busby, and Wise.

## OPINION

Ken Wise, Justice

These appeals concern the conservatorship of a child, Adam, who has been embroiled in custody litigation for most of his life.[1] This is Adam's second trip to the court of appeals.

The first appellate proceeding arose from the termination of Adam's parents' parental rights. Both his mother, T.H. ("Mother"), and his father, L.M. ("Father"), appealed the termination to this court. While the appeals were pending, two competing petitions were filed by people seeking to be named Adam's managing conservator: one by his paternal aunt, M.M.; and the other by his foster parents, Amy and Thomas Hood.

We issued our opinion in the parents' appeals in June 2015. *In re A.L.H.*, 468 S.W.3d 738 (Tex. App.–Houston [14th Dist.] 2015, no pet.). We affirmed the termination as to Mother, and her parental rights are no longer at issue. We reversed the termination as to Father due to legally insufficient evidence. After Father's parental rights were reinstated, the Hoods filed a petition to terminate his rights and adopt Adam.

Beginning in May 2016, a jury trial was held to decide: (1) should Father's parental rights be terminated, and (2) who should be Adam's conservator. The jury returned a verdict that Father's rights should be terminated, the Hoods should be Adam's managing conservator, and M.M. should not be a possessory conservator of

---

1. We use fictitious names for all minors referenced in this opinion. *See* Tex. R. App. P. 9.8(b)(2).

Adam. The trial court signed a judgment on the verdict.

M.M. and Father have separately appealed that judgment, and those are the appeals we decide today. The primary issues in both appeals are the sufficiency of the evidence to support the verdict and whether the trial court erred in permitting the Hoods' suit to be heard with M.M.'s suit. Each appellant also raises issues regarding particular pretrial and post-trial rulings.

This opinion is divided into three parts. First, we lay out the procedural and factual background. Second, we consider M.M.'s appeal. Third, we consider Father's appeal.

BACKGROUND

A. Proceedings in First Termination Suit

In January 2014, the Texas Department of Family and Protective Services ("the Department") filed suit seeking to terminate the parental rights of Mother and Father ("First Termination Suit"). The Hoods intervened over objection in the First Termination Suit in September 2014. They sought termination of Mother's and Father's parental rights and adoption of Adam or, alternatively, joint managing conservatorship of Adam.

The First Termination Suit was tried to the bench in December 2014. The trial court terminated both parents' rights and named the Department as Adam's sole managing conservator. Mother and Father both appealed ("the First Appeal"). The Hoods did not appeal.

In February 2015, while the First Appeal was pending, M.M. filed a petition to modify the parent-child relationship in which she sought sole managing conserva-

torship of Adam ("M.M.'s Suit to Modify"). The Hoods intervened, again over objection, in M.M.'s Suit to Modify in April 2015, again seeking to be named Adam's managing conservators ("Hoods' Intervention").

This court decided the First Appeal in June 2015. We affirmed the termination as to Mother, reversed and rendered the termination as to Father, and affirmed the trial court's naming of the Department as Adam's managing conservator. Father's parental rights were reinstated on June 16, 2015.

The Hoods filed a separate suit in January 2016 to terminate Father's parental rights and adopt Adam ("Hoods' Adoption Suit"). The Hoods' Adoption Suit was consolidated over objection with M.M.'s Suit to Modify ("Consolidated Cases").

The Consolidated Cases were tried to a jury for eight days beginning in May 2016. The following factual discussion comes from the evidence adduced at trial of the Consolidated Cases.

B. Adam's birth and removal

Mother and Father were incarcerated when Adam was born in September 2013, so Mother asked a family friend, Carlon, to take Adam until she got out of jail. Carlon told M.M., who lived in Arizona, that Adam was born and would be staying with her. M.M. paid for a stroller and infant car seat for Carlon to transport Adam. Carlon picked Adam up from the hospital when he was three days old. M.M. said she regularly spoke to Adam on the phone or "chatted" with him through an Internet video chat service while he lived with Carlon.

Adam is Mother's fourth child.[2] The Department removed each of her other three children shortly after birth. We refer to

2. Father is the alleged father of the first three children. He was established to be Adam's father.

those children as they were referred to at trial: (1) I.M., a boy born in November 2010; (2) Baby Girl, born in August 2011; and (3) Eddie, born in August 2012. Those removals were based generally on the child or Mother testing positive for drugs and the parents' refusal to consent to necessary medical treatment for the child, reported membership in a cult, and suspected mental illness. M.M. knew the bases of at least one child's removal. She also knew Father was a long-time drug user. She had not met Mother.

Mother was released from jail and moved in with Carlon and Adam within a month of his birth. Despite the circumstances of the other children's removals and not knowing Mother, M.M. believed Adam was safe with Mother because Carlon was with them. M.M. also presumed the Department would have removed Adam at birth if he was in danger. Father was released in early January 2014, at which time he also moved into Carlon's home. M.M. continued to believe Adam was safe with his parents and Carlon.

Adam had been showing symptoms of pertussis (whooping cough) for two or three weeks when Mother and her boyfriend took him to Dallas for a few days in mid-January 2014. He was still sick when they returned to Carlon's home, but his parents reportedly refused to take him to the hospital. Carlon let M.M. know Adam was sick, and M.M. told her to try to get him medical treatment. The record does not reflect whether Adam was treated at that time.

A week later, the Department received a referral alleging Adam's parents were medically neglecting him as well as drinking and using drugs. The Department removed Adam on January 30, placed him in foster care, and filed the First Termination Suit. M.M. contacted the Department and offered herself as a possible placement for Adam. However, the date of contact is in dispute. M.M. said she called around the time of Adam's removal. Department supervisor Teara McKentie testified M.M. did not call until April or May of 2014.

## C. Adam, Father, M.M., and the Hoods

### 1. Adam

#### a. Placement in the first foster home

Adam entered foster care at four months of age. He was placed in the same foster home as his brother, Eddie. The caregivers reported Adam cried excessively. The foster home lost its license and closed a few months later. When he left that home, Adam had little hair on the back of his head, suggesting he might have spent excessive time in an infant seat. He could not sit up unattended.

Adam could not be placed with M.M. because her home study was not complete. The Department contacted the adoptive mother of Adam's sister, Baby Girl, and asked if she could take Adam. The adoptive mother was not able to take him at that time but asked that the Department keep in touch with her because she would be interested in sibling visits between Baby Girl and Adam.

#### b. Placement with the Hoods

Adam was placed with Amy and Thomas Hood on May 23, 2014. McKentie testified the placement with the Hoods was expected to be temporary. The Hoods were classified as foster-to-adopt, which meant they were open to adopting a child placed with them. Amy Hood testified Adam bonded with her very quickly. He connected with Thomas more slowly but was attached to him within a month.

In July 2014, Adam's attorneys ad litem asked the trial court for an order prohibiting Adam from being moved from the

Hoods' home without court or ad litem approval. They based the request on Adam's strong bond with the Hoods and his progress in their care. The trial court granted the request in an order signed July 17, 2014 ("Do Not Move Order").

### c. Development

Early Childhood Intervention (ECI) workers assessed Adam when he was 10 months old. Most of Adam's abilities were average or above average. However, he failed his hearing screening and communicated at the level of a five-month-old baby, though he learned some sign language quickly after he was placed with the Hoods. ECI referred Adam to speech therapy to address his communication difficulties.

Adam responded well to ECI services and was discharged when he was 15 months old. His communication abilities, previously his lowest score, had improved to those of a 20–month-old child. Adam was assessed again when he was two and a half. Most of his abilities still fell in the average range; some were above average.

At the time of trial, Adam was said to get along with children of all ages. He preferred being with other children than being by himself. He had age-appropriate difficulty sharing.

### 2. Father

Father was represented by counsel at trial but did not attend personally. Almost 54 at the time of trial, Father began abusing drugs when he was 19. He failed to appear at court-ordered drug tests in September 2015 and February 2016. The Department treats failures to appear as positive results. He has been convicted at least six times for possession of controlled substances. Carlon, the family friend who cared for Adam when he was born, met Father at work in 2000. They had an intimate relationship. Father and other people sold drugs out of Carlon's house. Carlon and Father were arrested in September 2003 for possession of cocaine.

Adam's maternal grandmother, D.H., knew Father through his relationship with Mother. She never saw him use drugs but understood he had a history of drug abuse, criminal activity, and mental illness. D.H. last saw Father four and a half years before trial, but she had spoken with him more recently. She was talking with Mother on the phone when Father took the phone from Mother, talked to D.H., and would not allow Mother to speak further. D.H. said her husband and Father have had confrontations about Father's treatment of Mother.

In addition to his four children with Mother, Father has an adult daughter, Sheila, who has six children. He lived with Sheila and her children for some time. The Department removed Sheila's children while Father was living with them. The basis of the removal included drug use by the adults and the children, the presence of approximately 15 other children in the home who were not related to Father or Sheila, children hanging out of broken windows on the second floor of the house, the floors in poor repair, holes in the walls, and dangerous objects within the children's reach. Sheila tested positive for cocaine and marijuana at the time of removal.

Lisa McCartney, a court-appointed special investigator in this case, emailed Father his court-ordered family service plan. He confirmed he received it, then explained why he refused to comply with the plan. Two Department employees testified Father did not complete the plan's requirements.

Father called McCartney, left her voice mail messages, and sent her numerous

text messages. His communications concerned varying topics, including;

- UFOs and aliens;
- websites he wanted McCartney to visit;
- his association with the Rockefeller family;
- his ability to eliminate everyone's debt; and
- his desire to get a checking account with McCartney so they could go into business together.

Father told McCartney he would get his children back and nobody could stop him. He said he did not oppose M.M. having custody of Adam and was planning a trip to Arizona to see them. McCartney saw Father barge into Carlon's home several weeks before trial even though Carlon told him he could not come inside.

Father and Mother belonged to the United Nuwaubian Nation of Moors, which several witnesses testified was a cult. They believed they were not subject to the laws of the United States and did not have to follow the court's orders.

Department supervisor McKentie did not know why the Department did not seek to terminate Father's parental rights after the original termination was reversed. She believed there were new bases for termination, including Father's failure to complete his service plan requirements and appear at court-ordered drug tests. Another Department employee, Tonya Clay, personally believed Father's rights should be terminated.

### 3. M.M.

M.M. is Father's younger sister. She lives in Arizona. M.M. earned a degree in architecture and works as an industrial architecture designer. She has a college-age son, a teenage daughter, and custody of Eddie. She and her fiancé have been dating since 2008 and got engaged in 2015.

#### a. Relationship with Adam

M.M. first met Adam on December 3, 2014, the day the First Termination Suit was tried. M.M. and Adam had a one-hour visit at a Department office. She brought him toys and clothes.

Two weeks later, the Hoods set up an Internet video chat account for Adam so he and M.M. could communicate. Adam and M.M. chatted every few weeks for most of 2015. The content and length of the chats depended on Adam's mood.

M.M. travelled to Houston five times in 2015 to visit Adam. She gave Adam toys and clothes at each visit. She was sometimes joined by one or more of her son, daughter, and fiancé. M.M. did not see Adam for his second birthday but sent a card and gift. Eddie began to join M.M. on visits with Adam in January 2016. It is undisputed that M.M. was loving and affectionate during her visits with Adam.

#### b. Home study

A foster care licensing agency in Arizona conducted a home study on M.M. as part of the Department's evaluation of her as a placement for Adam.[3] The 5–page written report states four references were consulted about M.M. but does not identify them. The author concluded the report as follows:

> This worker found [M.M.] to be very stable and genuine in wanting to care for the child. She seems to have well educated and mannered children. [She] is cooperative and appears to have good

---

3. Texas has adopted the Interstate Compact on the Placement of Children. *See* Tex. Fam. Code Ann. § 162.102 (West 2014). The Compact's purpose is for states to cooperate with each other in placing children outside their home state. *See id.*

intentions in wanting to care for the child. Pending fingerprint clearance cards on [M.M.] and [her son] this worker recommends that the applicant is safe and appropriate to care for the child in the state of Arizona.

Adam's attorneys ad litem and the Hoods' attorney cross-examined M.M. extensively about the following facts not included in the report: (1) her 1998 arrest for alleged welfare fraud, (2) her conflicting statements about whether she drinks alcohol, (3) a civil judgment in 2009 finding her liable for animal cruelty, and (4) the adults who live or spend substantial time in her home.

M.M. was arrested in Arizona in February 1998 for unreported income, fraudulent schemes and practices, theft, and two counts of unlawful use of food stamps, all based on her receipt of about $2,800 in governmental assistance to which she was not entitled. She pleaded guilty and was placed on probation. According to the presentence investigation report, M.M. admitted lying on the applications for assistance but said she needed the money. At trial in this case, though, M.M. testified the arrest was a mistake because the state overpaid her. She also told the presentence investigator she began drinking when she was 15 years old. In her deposition in this case, she said she does not drink and had never had a drink. M.M. said she lied to the presentence investigator about drinking "to dirty [herself] up."

M.M. said she did not disclose the arrest during the home study process because nobody asked her. She also said the conviction was vacated. The trial court admitted into evidence a December 29, 2006 order from the Arizona criminal case "restoring any and all civil rights to the Defendant which were lost or suspended as a result of the conviction as stated in the application herein," "vacating the judgment of guilt," and "dismissing the charges against the Defendant as stated in the application herein." M.M. said the Arizona court clerk told her the vacatur meant she legally could say she was not arrested.

In the summer of 2009, M.M. went out of town and left her two dogs outside. She testified she left food and water for the dogs and made arrangements for a neighbor to care for them. However, one dog died of heat exhaustion. M.M. was cited for animal cruelty. When asked why she did not disclose the citation during her home study, she again said nobody asked her.

The report does not mention M.M.'s fiancé, D.W. He lives in Virginia and works as a defense contractor. M.M. testified she told the report's author about her relationship with D.W. but the author elected not to include him in the report because he did not live in her house. M.M. said the author told her that if D.W. lived in her house, he would have to have a fingerprint clearance check.

M.M.'s brother, P.J., is also not mentioned in the report. M.M. said she did not disclose the fact that P.J. stayed in her house off and on for several months in 2015 because he "was family" and "was just in and out" and she did not consider him to be living with her.

### c. Relationship with Father

M.M. described her feelings about Father:

I love my brother. I just don't like him. I don't like what he is made of. I don't like his character. We were never raised like that. ... He's not a reflection of me.

M.M. said she had "no relationship" with Father, meaning he was not "somebody you can call when you [sic] feeling down. Somebody you can lean on. Somebody you can take out and have a good time with." She testified the last time she saw him was

in April 2014 at a family funeral. M.M. said Father calls her sometimes, and she talks to him when he calls. She testified she has no intention of letting Father see Eddie or Adam and would call 911 if he came to her house.

Carlon, who cared for Adam when he was born, testified M.M. saw Father more recently than April 2014. She said M.M. and Father both spent the night in her home during trial of the First Termination Suit. Carlon said Father has barged into her home and she was not able to stop him. She said Father does whatever he wants and goes wherever he wants.

M.M. did not seek to terminate Father's parental rights but stated she was not opposed to termination. She insisted she would not let Father have any relationship or contact with Adam. M.M. understood Adam cannot be adopted if Father's parental rights are not terminated. She also understood that if she died before Adam was 18, Father would be entitled to custody of Adam. That possibility worried her.

### 4. The Hoods

Amy Hood earned a degree in bioenvironmental science from Texas A & M University. She worked as an environmental specialist in a large company at the time of trial. Thomas Hood worked as an inventory coordinator at the same company.

Amy and Thomas applied to be foster parents in November 2013. They took several classes as part of their application, including classes on CPR, other medical topics, and child behavior. They were approved as foster parents in April 2014. As foster parents, they are subject to monthly home inspections and random visits and must take ongoing classes.

### a. Relationship with Adam

Adam bonded with Amy quickly. He wanted to be with her all the time. Amy described Adam as fun and affectionate. He likes going for walks, reading, cuddling, playing, and doing art with her. Thomas described Adam as "his shadow." Adam loves to play and watch sports with Thomas, especially any sport with a ball. Adam enjoys going grocery shopping with Thomas and riding in the cart. When he wakes in the night, Adam calls for Thomas.

Amy was pregnant when Adam was placed with the Hoods. Beth Hood was born in October 2014. Amy testified Adam loved and was protective of Beth from the start. As of the time of trial, Adam and Beth played together and had a close relationship. Adam's daycare teachers reported he often talked about Beth.

The Hoods were put in touch with the adoptive family of Baby Girl, Adam's sister. The families got together twice shortly before trial. Both Amy and Baby Girl's adoptive mother said the visits went well and the children played well together. Both families intend to continue the relationship.

### b. Home study

A Texas placement agency conducted a home study on the Hoods. The 17–page written report identifies five references provided by the Hoods. The author recommended the Hoods be approved as foster parents for up to two children at a time, ranging from birth to three years old.

The report, written in 2014, contains two inaccuracies. First, it says Thomas graduated from Texas A & M University in 2004. Thomas testified at his deposition and at trial that he did not graduate from any college and did not suggest otherwise during the home study. A representative from their placement agency testified that the Hoods' written application says Thomas graduated from high school but not

from college. Second, the report correctly states Thomas was convicted of driving while intoxicated in 2009 but incorrectly states he no longer drinks. Amy and Thomas both testified they made no such statement. Both confirmed Thomas drinks alcohol occasionally but does not drink and drive. The Hoods did not see the report or know about its inaccuracies until it was produced in discovery in 2016.

### D. Expert testimony

#### 1. M.M. versus the Hoods

The trial court appointed Lisa McCartney to assess both possible placements for Adam. McCartney retired from the Department in 2011 after 30 years in various roles. Now a private investigator, she frequently makes recommendations about children's placements. She visited M.M. first "to give her a fair shot because she was family." She visited the Hoods last so it would not cloud her view if Adam was happy with them.

McCartney interviewed M.M., M.M.'s two children, Carlon, Carlon's daughter, and Adam's maternal grandmother (to verify statements made by M.M.). She also visited M.M.'s home. McCartney described M.M. as "an educated, very nice" person who can love Adam unconditionally. Nevertheless, she "unfortunately" had concerns with M.M. as a placement for Adam. McCartney discovered several of the inconsistencies and omissions in the home study report. She believed M.M. is in denial about the danger Father poses to Adam, particularly if his parental rights are not terminated. McCartney was confident M.M. wants to protect Adam but was concerned she will not be able to do so given her ongoing relationship with Father and Father's history of dominant, uncontrollable behavior. McCartney was also troubled that M.M. did not object to Adam living

with Mother and Father for the first four months of his life.

By contrast, McCartney had no concerns with the Hoods as a placement for Adam. She testified about her surprise at how well Adam is doing with the Hoods:

[Adam] is a completely different child in their home. I didn't know that he could sign. I didn't know that he could count to ten in Spanish. I didn't know that he could communicate as well because he had been somewhat stand offish, which is kind of normal, I think, when meeting strangers or another observer; but I didn't expect him to be as developmentally advanced as he was. He is very— that's his house. He's, clearly, very attached to the foster parents, to his foster sister. He is—jumps around and talks and is, clearly, part of that family and sees himself as part of that family, and it was kind of striking because of the other contacts I have had with him. I had no idea he could speak that well.

McCartney believed the Hoods can love Adam unconditionally and protect him.

#### 2. Impact on Adam if removed from the Hoods' home

Martha Kennedy, Ph.D., has been a clinical child psychologist for 35 years. The trial court appointed her to evaluate Adam's overall development and emotional functioning, particularly the impact on him if he were removed from the Hoods' home. She clarified she was evaluating Adam, not the merits of one placement over the other. Dr. Kennedy reviewed medical and Department records, interviewed M.M. and the Hoods, and observed Adam with M.M. and with the Hoods. Like McCartney, she watched him with M.M. first, then with the Hoods.

Dr. Kennedy said for a child Adam's age, bonding is "the nuts and bolts of emotional attachment." She explained:

[Self regulation of emotion] is the heart of attachment. That's what the child is getting from the attachment figure, from the mother. When the child is distressed, the mother or the father, be it as it may, you know uses that relationship to help that child learn · how to soothe themselves .... Calm themselves. ... Deal with strong emotion. ...

ECI records state Adam resisted being removed from Amy's arms (even by Thomas) at his 10–month assessment, cried in unfamiliar situations, and responded differently to directions from the Hoods as opposed to other adults. Dr. Kennedy said these behaviors indicate Adam was "satisfactorily progressing in attachment in an age-appropriate manner."

Dr. Kennedy observed Adam for nine hours over a few days when he was two and a half years old, beginning with unfamiliar people in unfamiliar settings and progressing to familiar people in familiar settings. She twice saw Adam forcibly separated from the Hoods so he could visit with M.M. Both times "he responded with distress and protest, as would be expected for a securely attached child." M.M. was "very appropriate and affectionate" with Adam during their times together. Still, Adam remained passive, nonverbal, and minimally responsive to her during the first session. He quickly approached the Hoods when the visit ended. By the end of the session on the second day, Adam engaged in physical, active play with M.M. He approached her for a game rather than waiting for her to come to him.

Adam acted differently with the Hoods. He separated easily from them at Dr. Kennedy's office, tested limits with them, and approached them multiple times for play and caregiving. He was very verbal and active during sessions with the Hoods. Dr. Kennedy believed Adam was securely at-

tached to the Hoods and was developing "remarkably well for all the changes that he's had in his life."

Dr. Kennedy explained that a securely attached child will perceive being removed from his primary attachment figure as abandonment. Regardless of the support and love the adults in the new placement give the child, he will perceive it as trauma. "It's an assault upon [his] being," she said. She described the possible short- and long-term effects on Adam if he is removed from the Hoods' home:

> In the short-term [Adam] can be expected to regress emotionally and developmentally, be less independent, more passive and/or clingy. Cognitive skills are likely to continue to develop, though they may stall for some period of time. Over time he can be expected to adapt functionally and form new relationships. New relationships will not have the security of the primary bond, and [Adam] will be at risk for anxiety and depression in preschool years.
>
> In the long-term there are concerns that [Adam's] development in multiple areas may be adversely affected. A stable attachment, which forms in the critical period of gestation through the 3rd year (where he is now), impacts the developing brain and is central to the organization of a child's personality, including the ability to cope with stress and sustain close social relationships throughout life. Other areas know[n] to be impacted include verbal and nonverbal communication, self-regulation of emotion and behavior, personal insight, empathy, and morality.

Clinical psychologist Sandra Rouce, Ph. D., testified on behalf of M.M. Dr. Rouce said a move to M.M.'s home could be transitioned to decrease any trauma to Adam. She believed Dr. Kennedy was overreaching in her conclusions, specifically in

the possible long-term negative effects on Adam if he were removed from the Hoods' home. Dr. Rouce opined that Adam is more resilient due to his experiences. She said Adam's attachment to the Hoods has given him the ability to bond with others and will help him adapt to a new placement.

Dr. Rouce has no personal experience with Adam. She observed him only once, during a visit with M.M. at a Department office. She did not observe him with the Hoods. She did not review his records or interview anybody about the case.

### E. Verdict and Judgment in Consolidated Cases

The jury answered four questions as follows:

1. Should the parent-child relationship between [Father] and [Adam] be terminated? **Answer: Yes.**

2. Should the order that designates [the Department] as sole managing conservator of [Adam] be modified to appoint a new sole managing conservator? **ANSWER: Yes.**

3. Who should be appointed sole managing conservator of [Adam]? Select the name or names of one of the two choices provided below as a Sole Managing Conservator and write the name or names in the blank for the answer provided below. Your choices are (1) [M.M.]; or (2) Prentiss Thomas Hood, Jr. and Amy Hood. AN-SWER: **Prentiss Hood / Amy Hood**

4. [Not answered per instructions]

5. Should [M.M.] be appointed possessory conservator of [Adam]? **ANSWER: No.**

The trial court denied M.M.'s motion for judgment non obstante veredicto (JNOV), denied her motion for sibling access, and awarded attorney's fees to the Hoods. M.M. and Father appealed separately. The Hoods are the appellees in each appeal. The Department is not a party on appeal.

### M.M.'S APPEAL

M.M. raises thirteen issues on appeal complaining of the jury's findings with respect to managing conservatorship as well as the trial court's rulings on the Do Not Move Order, discovery, intervention, consolidation, the motion for JNOV, and post-judgment motions.[4]

### I. Modification of Managing Conservatorship Order (Issues 3, 8, and 10)

M.M. brings three issues concerning the jury's verdict. In issue 10, M.M. contends the evidence was legally and factually sufficient to support a finding that it was in Adam's best interest to be placed with her. In issue 8, she asserts the evidence is legally and factually insufficient to support the jury's answer to question 2 because there was insufficient evidence that a material and substantial change in circumstances occurred. In issue 3, she contends there was no need to expend state re-

---

4. Some of M.M.'s issues are difficult to address because they do not assign error. *See* Tex. R. App. P. 38.1(f) ("[Appellant's] brief must state concisely all issues or points presented for review. ..."). For example, issue 3 states, "The state's resources have been to [sic] remove the child from its biological family through the ad litems and the court." Given our duty to construe briefing rules liberally, we have grouped her issues by topic where appropriate and consider each group as a single, broad issue. *See* Tex. R. App. P. 38.9 ("substantial compliance" with briefing rules is generally sufficient); Tex. R. App. P. 38.1(f) (".... The statement of an issue or point will be treated as covering every subsidiary question that is fairly included."). Additionally, the issues stated in the table of contents of M.M.'s brief are not the same as the issues stated in the body of the brief. We have considered the issues as stated in the body of the brief.

sources for the Hoods care for Adam when M.M. could provide a suitable home.

### A. Legal standards

#### 1. Requirements for modification

█ In an effort to ensure stability and continuity for children, Texas law imposes "significant hurdles" before an order appointing a managing conservator may be modified. *In re A.L.E.*, 279 S.W.3d 424, 428 (Tex. App.–Houston [14th Dist.] 2009, no pet.). As relevant to this case, a conservatorship order may be modified if modification is in the child's best interest and "the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed" since the date of rendition of the conservatorship order. Tex. Fam. Code Ann. § 156.101(a)(1)(A) (West 2014).

█ Courts may consider the following non-exclusive factors to determine the child's best interest: the child's desires; the child's current and future physical and emotional needs; current and future emotional and physical danger to the child; parental abilities of the persons seeking custody; programs available to assist those persons seeking custody to promote the best interest of the child; plans for the child by the individuals or agency seeking custody; stability of the home or proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). As noted, this list of factors is not exhaustive, and evidence is not required on all the factors. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.–Houston [14th Dist.] 2012, no pet.).

In addition, the Family Code sets out thirteen factors to be considered in evaluating a parent's willingness and ability to provide the child with a safe environment. *See* Tex. Fam. Code Ann. § 263.307(b) (West 2014 & Supp. 2016). Those factors are: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child with: (a) minimally adequate health and nutritional care; (b) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (c) guidance and supervision consistent with the child's safety; (d) a safe physical home environment; (e) protection from repeated exposure to violence even though the violence may not be directed at the child; and (f) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of

an extended family and friends is available to the child. *Id.*; *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

A fact finder is not confined to rigid or definite guidelines in deciding whether a material and substantial change of circumstances has occurred. *A.L.E.*, 279 S.W.3d at 428. Instead, the determination is fact-specific and must be made according to the circumstances as they arise. *Id.* Changed circumstances may be established by circumstantial evidence. *Id.* at 429.

## 2. Standard of review

■■■ A jury's findings underlying a conservatorship decision are subject to ordinary legal and factual sufficiency review. *In re P.A.C.*, 498 S.W.3d 210, 214 (Tex. App.–Houston [14th Dist.] 2016, pet. denied); *Arredondo v. Betancourt*, 383 S.W.3d 730, 734 (Tex. App.–Houston [14th Dist.] 2012, no pet.). In a legal-sufficiency review, we view the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable fact finder could, and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). In a factual-sufficiency review, we examine the entire record and set aside a jury's finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *In re T.T.*, 228 S.W.3d 312, 316 (Tex. App.–Houston [14th Dist.] 2007, pet. denied). We are mindful in both reviews that the jury, as fact finder, was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819; *T.T.*, 228 S.W.3d at 316. We may not substitute our judgment for the fact finder's, even if we would reach a different answer on the evidence. *See Maritime*

*Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998); *T.T.*, 228 S.W.3d at 316.

## B. Analysis

### 1. Best interest (Issues 3 and 10)

■■■ M.M. does not assert the evidence is insufficient to support the jury's answer to question 3 that the Hoods should be Adam's managing conservator. Rather, M.M. asserts the evidence is sufficient to show it is in Adam's best interest to be placed with her. Effectively, she contends the jury should have chosen her instead of the Hoods to be Adam's managing conservator. M.M. also contends it is a waste of state resources for Adam to live with foster parents when she is able to provide a suitable home for him. This complaint also amounts to an assertion that the jury should have picked her instead of the Hoods. We may not substitute our judgment for that of the jury so long as the evidence falls within the zone of reasonable disagreement. *City of Keller*, 168 S.W.3d at 822.

■■■ Even if issue 10 could be construed as a challenge to the sufficiency of the evidence to support the jury's answer to question 3, we would conclude legally and factually sufficient evidence supports the answer. The evidence showed that Adam thrived in the Hoods' care, he is securely attached to the Hoods, and removing him from their home would have negative short- and long-term effects. The jury heard evidence of inconsistencies and dishonesty in M.M.'s statements, as well as an expert's misgivings about M.M. as a placement for Adam. The evidence was undisputed that Father uses drugs, engages in crime, is suspected to suffer from mental illness, and is a member of a group considered to be a cult. Multiple witnesses testified it concerns them that M.M. has not sought to terminate Father's parental rights because it opens the possibility that

Father could have a relationship with Adam in the future. Ample evidence supports the jury's finding that the Hoods should be Adam's managing conservators. We overrule issues 3 and 10.

### 2. Changed circumstances (Issue 8)

 M.M. contends the evidence is legally and factually insufficient to support the jury's answer to question 2 because the Hoods did not show a material and substantial change in circumstances had occurred since the Department was named Adam's sole managing conservator.

 The party seeking to modify a conservatorship order must prove a material and substantial change in the circumstances of any of the following: the child, the parent, the sole managing conservator, the possessory conservator, or any other party affected by the order denying termination. *See* Tex. Fam. Code Ann. § 156.101(1) (West 2014). We review the sufficiency of the evidence mindful that the jury was not confined to rigid or definite guidelines in deciding whether a material and substantial change of circumstances occurred. *A.L.E.*, 279 S.W.3d at 428.

It was undisputed that since the First Termination Suit:

- Father's parental rights were reinstated;

- Because Father's rights were reinstated, Adam lost his eligibility for adoption;

- Adam lived and bonded with the Hoods for nearly 18 more months;

- The Department no longer sought termination of Father's rights;

- Adam's biological brother Eddie went to live with M.M., and the Hoods began a relationship with Adam's biological sister, both of which were relevant to the best-interest analysis for Adam;

- A court-appointed expert assessed both M.M. and the Hoods as possible placements and concluded it was in Adam's best interest to be placed with the Hoods; and

- A second court-appointed expert evaluated Adam's overall development and emotional functioning and concluded removing him from the Hoods' home would affect him negatively.

 Viewing the evidence in the light most favorable to the jury's answer to question 2, we conclude this undisputed evidence was legally sufficient to support the answer. *See City of Keller,* 168 S.W.3d at 827. The evidence is also factually sufficient because, considered in light of the entire record, the jury's answer is not so contrary to the overwhelming weight of evidence to be clearly wrong and unjust. *See T.T.*, 228 S.W.3d at 316.[5] We overrule issue 8.

---

5. Even if the evidence were not sufficient, we would overrule this issue because M.M. judicially admitted a material and substantial change in circumstances had occurred. A judicial admission is a formal waiver of proof usually found in the pleadings or in a stipulation of the parties. *Gevinson v. Manhattan Const. Co.*, 449 S.W.2d 458, 466 (Tex. 1969). "The vital feature of a judicial admission is its conclusiveness on the party making it. It not only relieves his adversary from making proof of the fact admitted but also bars the party himself from disputing it." *Id.* Paragraph 8 of M.M.'s Amended Petition to Modify the Par-

ent–Child Relationship states, "The circumstances of the children, a conservator, or other party affected by the order to be modified have materially and substantially changed since the date of the rendition of the order to be modified." That statement is a judicial admission by M.M. of sufficiently changed circumstances to justify modification of the conservatorship order. The admission relieved the Hoods of proving a material and substantial change in circumstances had occurred. *See In re L.C.L.*, 396 S.W.3d 712, 718 (Tex. App.–Dallas 2013, no pet.).

## II. Pretrial Rulings

### A. Do Not Move Order (Issues 1, 4, and 6)

 The following sentence is handwritten on the Do Not Move Order: "Subject child shall not be moved from current foster placement without ad litem and/or court approval." M.M. asserts in issues 1, 4, and 6 that the Do Not Move Order violated her right to due process and the trial court erred in not lifting it.

To preserve a complaint for appellate review, an appellant must show (1) she made the complaint to the trial court by a timely request, objection, or motion, and (2) the trial court ruled on the request or refused to rule on the request and appellant objected to the refusal. *See* Tex. R. App. P. 33.1(a). The record does not contain a written motion by M.M. asking the trial court to lift the Do Not Move Order. The only request M.M. made was during her testimony at a hearing on February 18, 2016. Her lawyer asked her, "Are you requesting that the Court lift the do not move order and place this child with you?" M.M. answered, "Yes." We assume without deciding that M.M.'s oral request was sufficient under Rule 33.1(a).

The trial court did not rule on M.M.'s request, either orally on the record or by written order. To the contrary, when Adam's attorney ad litem asked the trial court to leave the Do Not Move Order in place, the trial court stated, "I'm not making a ruling on that today." There is no later request regarding the Do Not Move Order in the record, and M.M. does not appear to have objected to the trial court's refusal to rule on her request. Accordingly, M.M. has not preserved error regarding the Do Not Move Order. *See W.W. Webber, L.L.C. v. Harris Cty. Toll Road Auth.*, 324 S.W.3d 877, 882 n.10 (Tex. App.–Houston [14th Dist.] 2010, no pet.) (overruling complaint regarding admission of certain documents because appellant did not obtain ruling on its objection to documents and did not suggest trial court refused to rule on objection). We overrule issues 1, 4, and 6.

### B. Discovery (Issue 11)

 M.M. asserts the trial court erred in granting a motion to quash and for a protective order filed by Adam's attorneys ad litem regarding written discovery M.M. propounded to them. We review a trial court's actions denying discovery for an abuse of discretion. *Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 661 (Tex. 2009). A trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law, *id.* or acts without reference to guiding rules or principles. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011).

We do not know precisely what information M.M. sought because she did not describe it in her brief and the record does not contain the propounded discovery. Accordingly, we are unable to say the trial court abused its discretion in quashing the discovery. *See* Tex. R. App. P. 33.1(a); *Citigroup Global Markets Realty Corp. v. Stewart Title Guar. Co.*, 417 S.W.3d 592, 605 (Tex. App.–Houston [14th Dist.] 2013, no pet.).

From the record of the hearing on the motion to quash, it appears M.M. propounded requests for disclosures and requests for production regarding Lisa McCartney, the special investigator the trial court appointed to assess the two possible placements. McCartney was deposed in March 2016, and M.M. questioned her. M.M. does not suggest she lacked sufficient information to prepare for the deposition or effectively depose McCartney. Likewise, M.M. does not suggest she was unable to cross-examine McCartney effectively at trial due to the order quash-

ing discovery. Accordingly, any error in quashing the discovery is harmless and not reversible. *See* Tex. R. App. P. 44.1(a). We overrule issue 11.

### C. Intervention (Issues 2, 7, and 14)

 M.M. contends the trial court erred in denying her motion to strike the Hoods' Intervention for three reasons: (1) they lacked standing, (2) the Department did not consent to the intervention, and (3) their claim for conservatorship is barred by res judicata and collateral estoppel. We review a trial court's order on intervention for an abuse of discretion. *See Guaranty Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex. 1990) (op. on reh'g). However, to the extent the trial court's ruling depends on an issue of statutory interpretation, we review the ruling de novo. *Spurck v. Tex. Dept. of Family & Protective Servs.*, 396 S.W.3d 205, 217 (Tex. App.–Austin 2013, no pet.).

 "Any party may intervene by filing a pleading, subject to being stricken out by the court for sufficient cause on the motion of any party." Tex. R. Civ. P. 60. An intervenor does not need permission to intervene; rather, the party who opposes the intervention must file a motion to strike the intervention. *Guaranty Federal*, 793 S.W.2d at 657.

The record does not contain a written motion by M.M. to strike the petition in intervention, but she made the request orally at the pretrial conference on May 17, 2016, and the trial court denied it. At that time, the Hoods' live pleading was their fifth amended petition in intervention, filed May 11, 2016.

### 1. Standing

 Generally, an intervenor must have standing to maintain an original suit in order to intervene. *Guaranty Federal*, 793 S.W.2d at 657. A party's standing to file an original suit affecting a parent-child relationship is governed by section 102.003 of the Family Code. *See* Tex. Fam. Code Ann. § 102.003 (West 2014 & Supp. 2016). Section 102.003 enumerates the people who may file an original suit affecting the parent-child relationship. One of those people is "the foster parent of a child placed by the Department of Family and Protective Services in the person's home for at least 12 months ending not more than 90 days preceding the date of the filing of the petition." *Id.* § 102.003(a)(12).

 Adam was placed with the Hoods on May 23, 2014. The Hoods filed their live petition in intervention on May 11, 2016, nearly two years after Adam came into the Hoods' home. The Hoods would have had standing under section 102.003(a)(12) to file an original suit affecting the parent-child relationship on May 11, 2016. Accordingly, they could properly intervene. *Guaranty Federal*, 793 S.W.2d at 657.

### 2. Consent

M.M. also contends the Hoods' intervention was improper because they needed the consent of Adam's managing conservator—the Department—to intervene. She relies on *Chapman v. Home*, 561 S.W.2d 265 (Tex. Civ. App.–Fort Worth 1978, no writ), to support that proposition. *Chapman* did not involve an intervention. It concerned the requirement of the managing conservator's consent to adoption. *See id.* at 267. The consent requirement for adoption is statutory. *See* Tex. Fam. Code Ann. § 162.010(a) (West 2014) ("Unless the managing conservator is the petitioner [for adoption], the written consent of a managing conservator to the adoption must be filed. The court may waive the requirement of consent by the managing conservator if the court finds that the consent is being refused or has been revoked without good cause."). M.M. does not cite, and we

are not aware of, a consent requirement for intervention.

M.M. also cites *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981). *Cameron* is a suit by home buyers against their real estate agent under the Deceptive Trade Practices Act. It has nothing to do with modification of a conservatorship order. Therefore, we conclude the Hoods did not need the Department's consent to intervene.

### 3. Res judicata and collateral estoppel

■ M.M. asserts the Hoods' claim for conservatorship is barred by res judicata and collateral estoppel because the trial court denied their request for conservatorship in the First Termination Suit.

■ Res judicata precludes relitigation of claims that have been finally adjudicated or arise out of the same subject matter and could have been litigated in the prior action. *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex. 1996). Collateral estoppel prevents relitigation of particular issues already resolved in a prior suit. *Barr v. Resolution Trust Corp. ex rel. Sunbelt Fed. Sav.*, 837 S.W.2d 627, 628 (Tex. 1992). Both doctrines are affirmative defenses, and the party asserting them bears the burden to plead and prove their elements. *Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 801 (Tex. 1994); *Primo v. Great Am. Ins. Co.*, 455 S.W.3d 714, 728 (Tex. App.–Houston [14th Dist.] 2015, pet. granted).

■ The requirements of res judicata are: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action. *Amstadt*, 919 S.W.2d at 652. The requirements of collateral estoppel are: (1)

the facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action. *Primo*, 455 S.W.3d at 728.

■ A final judgment in a custody proceeding is res judicata of the best interests of a child as to conditions then existing. *Knowles v. Grimes*, 437 S.W.2d 816, 817 (Tex. 1969); *accord In re C.Q.T.M.*, 25 S.W.3d 730, 735 (Tex. App.–Waco 2000, pet. denied) ("A prior custody decree is res judicta of the best interests of the child regarding conditions existing at the time of the prior decree.").

The parties in the First Termination Suit and the present Consolidated Cases are not the same. M.M. did not file suit seeking managing conservatorship of Adam in the First Termination Suit. She was not a party to the judgment. The task of the trial court as fact finder in the First Termination Suit was to decide between the Department and the Hoods as managing conservator. In contrast, M.M. did file suit in the Consolidated Cases and is a party to the judgment. The jury in the Consolidated Cases had to choose among the Department, the Hoods, and M.M. to be Adam's managing conservator.

The facts in the two proceedings also are not the same. Many conditions existed during the Consolidated Cases that did not exist when the trial court denied the Hoods' request for conservatorship the in First Termination Suit. For example, Father's parental rights had been reinstated. As a result, Adam lost his eligibility for adoption. The Department no longer sought termination of Father's rights. Adam had lived and bonded with the Hoods for nearly 18 additional months. We conclude M.M. has not satisfied her burden to show that the Hoods' Intervention

is barred by res judicata or collateral estoppel. We overrule issues 2, 7, and 14.

### D. Consolidation (Issue 9)

M.M. challenges the trial court's order granting the Hoods' motion to consolidate the Hoods' Adoption Suit with M.M.'s Suit to Modify. We review a ruling on a motion to consolidate for an abuse of discretion. *Thuesen v. Amerisure Ins. Co.*, 487 S.W.3d 291, 296 (Tex. App.–Houston [14th Dist.] 2016, no pet.).

Texas Rule of Civil Procedure 174(a) governs consolidation:

When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

Tex. R. Civ. P. 174(a). Rule 174(a) does not require that all questions of law or fact be common to the cases to be consolidated. Even one common question of significance suffices for consolidation. *See Hong Kong Dev., Inc. v. Nguyen*, 229 S.W.3d 415, 439 (Tex. App.–Houston [1st Dist.] 2007, no pet.) (op. on reh'g).

M.M.'s Suit to Modify and the Hoods' Adoption Suit involved a common, crucial question: who should be Adam's managing conservator? We cannot say the trial court abused its discretion in consolidating the two cases so a single jury could answer that question. We overrule issue 9.

### III. Motion for JNOV (Issue 5)

M.M. contends the trial court should have granted her motion for JNOV because the evidence does not support a finding that Adam's present living environment might endanger his health or significantly impair his emotional development.

We review the trial court's denial of a motion for JNOV under a legal-sufficiency standard. *Manjlai v. Manjlai*, 447 S.W.3d 376, 379 (Tex. App.–Houston [14th Dist.] 2014, pet. denied).

M.M.'s motion for JNOV was based on res judicata and collateral estoppel. She argued the Hoods' claim for conservatorship was barred because the trial court denied the same claim in the First Termination Suit. The motion does not mention the evidence or lack thereof regarding danger posed by Adam's present living environment. Accordingly, on appeal, M.M. may not challenge the denial of her motion for JNOV on that basis. *Brush v. Reata Oil & Gas Corp.*, 984 S.W.2d 720, 724–25 (Tex. App.–Waco 1998, pet. denied) (appellant could not challenge trial court's denial of motion for JNOV on basis of common law fraud because motion did not ask trial court to render JNOV on that basis). We overrule issue 5.

### IV. Post–Judgment Rulings

#### A. Sibling access (Issue 12)

M.M. contends the trial court abused its discretion and fundamentally erred by denying her motion for sibling access between Adam and Eddie.

The sibling of a child who is separated from the child because of an action taken by the Department may request access to the child. Tex. Fam. Code Ann. § 153.551(a) (West 2014). The trial court shall order reasonable access if the court finds access is in the best interest of the child. *Id.* § 153.551(c). An order under section 153.551 is reviewed for an abuse of discretion. *In re D.R.L.M.*, 84 S.W.3d 281, 305 (Tex. App.–Fort Worth 2002, pet. denied), *superseded on other grounds by* Tex. Fam. Code Ann. § 263.405 (West 2005).

The hearing on M.M.'s motion reflects that M.M., the Hoods, and Adam's attorneys ad litem agreed Adam and Eddie should visit each other. The day after the trial ended, the Hoods invited M.M. to visit Adam. The trial judge said he "thought that was great." The question was whether the visits should be court-ordered given the contentious nature of the case. The trial court had this exchange with counsel:

Ad litem: Judge, I believe this case has been highly contentious.

Court: You think?

Ad litem: Yeah. And to tie these people together legally until this child is 18 is not in his best interest.

Court: You feel as though that would be tying [M.M.] and the Hoods together?

Ad litem: Correct. With the child in the middle and I don't think that's right. And they also want to adopt him.

. . .

M.M.'s counsel: [W]ith regards to this particular case, it's [Eddie] who is seeking access to his brother. He's had visitations with his brother. There has been uncontroverted testimony that both of these kids know each other. And so when you ask me what the harm is in terms of making a Court order, I'm on the flip side. What is the harm—if they're saying that they're going to do it, what is the harm having a Court order to ensure that they do it?

Court: Because just what my ad litem said. The whole case has been so contentious. It's been so—y'all have fought every inch of the way, both sides, all of the parties. It has been an extremely nasty trial. It's been—there's been innuendos of all kinds of things and that your jury picked up on it. That's exactly what they told me.

. . .

Court: If I order access, that means that for the next 15 years or 16 years, [M.M.] and the Hoods are still tied together.

M.M.'s counsel: But that's what they're telling you they're going to do anyway.

Court: Why order it?

M.M.'s counsel: And again, the adverse is why not order it to ensure that it happens. This is with regards to [Eddie]. [Eddie] has a right to have a relationship with his brother. And when Mr. and Mrs. Hood—

Court: I'm gonna take this under advisement. I'm gonna think about it.

The trial court denied the motion two days later.

The trial judge's comments reflect he understood and weighed the merits of both positions. Even if we would have decided the matter differently, we cannot say on this record that the trial court abused its discretion in concluding that mandatory sibling access was not in Adam's best interest. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). We overrule issue 12.

### B. Attorney's fees (Issue 13)

M.M. challenges the trial court's assessment of the Hoods' attorney's fees against her. Attorney's fees in a suit affecting the parent-child relationship are governed by section 106.002 of the Family Code. *See* Tex. Fam. Code Ann. § 106.002 (West 2014). Trial court rulings on attorney's fees are reviewed for an abuse of discretion. *Bruni v. Bruni*, 924 S.W.2d 366, 368 (Tex. 1996); *Watts v. Oliver*, 396 S.W.3d 124, 132 (Tex. App.–Houston [14th Dist.] 2013, no pet.).

On appeal, M.M. asserts the award of fees is unconscionable and is in bad faith. She cites no authority for that assertion. *See* Tex. R. App. P. 38.1(i) ("[Appellant's]

brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and the record.") Likewise, she did not raise that issue in the trial court. *See* Tex. R. App. P. 33.1(a)(1)(A) (party must state grounds for ruling with sufficient specificity to make trial court aware of complaint). M.M. also contends the fee award "is not in conformity of awarding attorney's fees as necessaries for the child." She did not raise that issue in the trial court, either. *See id.* We conclude M.M. has waived any error regarding the attorney's fee award. We overrule issue 13.

## V. Issues Raised in Reply Brief

■ In her reply brief, M.M. asserts for the first time that her trial lawyers as well as Adam's attorneys ad litem and the Department's lawyer rendered ineffective assistance of counsel. She waived that issue because she did not raise it in her opening brief. *Phillips Dev. & Realty, LLC v. LJA Eng'g, Inc.*, 499 S.W.3d 78, 89 (Tex. App.–Houston [14th Dist.] 2016, pet. denied).

■ In any event, the doctrine of ineffective assistance of counsel does not generally extend to civil cases. *Cherqui v. Westheimer St. Festival Corp.*, 116 S.W.3d 337, 344–45 (Tex. App.–Houston [14th Dist.] 2003, no pet.). One exception is that a parent may raise a claim for ineffective assistance of counsel in a parental-termination case. *In re J.O.A.*, 283 S.W.3d 336, 339 (Tex. 2009). We are not aware of any exception allowing such a claim by a nonparent seeking to modify a conservatorship order, nor are we aware of any authority for M.M. to assert ineffective-assistance claims on behalf of Adam or the Department.

We affirm the judgment as to M.M.

## FATHER'S APPEAL

Father raises five issues concerning service of process, sufficiency of the evidence to support termination, whether the Hoods' claim for conservatorship is barred by res judicata and collateral estoppel, the jury charge, and whether the judgment conforms to the pleadings.

## VI. Service of Process (Issue 2)

■ Father asserts the judgment against him is void because he was not served with citation for the Hoods' Adoption Suit, which is the proceeding in which the Hoods sought termination of Father's parental rights.

■ Judgment may not be rendered against any defendant except with service, acceptance or waiver of process, or appearance by the defendant. *See* Tex. R. Civ. P. 124. Filing an answer constitutes a general appearance, thereby dispensing with the need for the issuance and service of citation and waiving any complaints about service. Tex. R. Civ. P. 121; *see In re $475,-001.16*, 96 S.W.3d 625, 628–29 (Tex. App.–Houston [1st Dist.] 2002, no pet.).

The trial court appointed an attorney ad litem for Father in M.M.'s Suit to Modify after his parental rights were reinstated by our decision in the First Appeal. The attorney ad litem filed an answer on August 4, 2015. After the Hoods' Adoption Suit was consolidated with M.M.'s Suit to Modify, Father's attorney ad litem filed a first amended answer on May 9, 2016. Father's answers constituted general appearances. *Baker v. Monsanto Co.*, 111 S.W.3d 158, 160–61 (Tex. 2003) (per curiam); *In re D.M.B.*, 467 S.W.3d 100, 103 (Tex. App.–San Antonio 2015, no pet.) (answer filed by father's attorney ad litem in parental termination case was general appearance, which waived all complaints about service); *Phillips v. Dallas Cty. Child Protective Servs. Unit*, 197 S.W.3d

862, 865 (Tex. App.–Dallas 2006, pet. denied) (same).

Father contends the answers of his attorney ad litem did not constitute an appearance because Father did not specifically authorize his attorney ad litem to waive service on his behalf. *See Leach v. City Nat'l Bank*, 733 S.W.2d 578, 579 (Tex. App.–San Antonio 1987, no writ); *H.L. McRae Co. v. Hooker Constr. Co.*, 579 S.W.2d 62, 64 (Tex. Civ. App.–Austin 1979, no writ). *Leach* and *H.L. McRae* are distinguishable because the defendants were not entitled to appointment of counsel, and they were not appointed attorneys ad litem. They were private, civil suits in which the defendants were represented by retained counsel and had not appeared in the case. We overrule issue 2.

## VII. Termination (Issue 1)

The jury found seven statutory bases on which to terminate Father's parental rights. Father asserts there is insufficient evidence to sustain any of the findings.

### A. Legal standards

#### 1. Termination in general

▮▮▮ Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re S.R.*, 452 S.W.3d 351, 357 (Tex. App.–Houston [14th Dist.] 2014, pet. denied). Although parental rights are of constitutional magnitude, they are not absolute. The child's emotional and physical interests must not be sacrificed merely to preserve the parent's rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

▮▮▮ Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001 (West 2014 &

Supp. 2016); *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). " 'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *accord J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *S.R.*, 452 S.W.3d at 358.

▮▮▮ Parental rights can be terminated upon proof by clear and convincing evidence that the parent has committed an act described in section 161.001(b)(1) of the Texas Family Code, and termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b). Only one predicate finding under section 161.001(b)(1) is necessary to support termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

#### 2. Termination after previous denial of termination

Termination of a parent's rights may be sought under section 161.004 of the Family Code when termination has been previously denied. Section 161.004 states:

(a) The court may terminate the parent-child relationship after rendition of an order that previously denied termination of the parent-child relationship if:

(1) the petition under this section is filed after the date the order denying termination was rendered;

(2) the circumstances of the child, parent, sole managing conservator, possessory conservator, or other party affected by the order denying termination have materially and substantially changed since the date that the order was rendered;

(3) the parent committed an act listed under Section 161.001 before the date the order denying termination was rendered; and

(4) termination is in the best interest of the child.

(b) At a hearing under this section, the court may consider evidence presented at a previous hearing in a suit for termination of the parent-child relationship of the parent with respect to the same child.

This court reversed the trial court's December 17, 2014 judgment terminating Father's parental rights after concluding that "[t]he record contains no evidence that the child was in an endangering environment before the child was taken into the Department's care or that the father knowingly exposed the child to such an environment." *A.L.H.*, 468 S.W.3d at 747.

In light of this history, Father's parental rights could be terminated in this subsequent proceeding in one of two ways: (1) under section 161.001, which requires clear and convincing evidence of acts or omissions having occurred since the denial, or (2) under section 161.004, which requires clear and convincing evidence of an act or omission under section 161.001 that occurred before the denial and evidence of a material and substantial change since the denial. *In re D.N.*, 405 S.W.3d 863, 870 (Tex. App.–Amarillo 2013, no pet.); *In re K.G.*, 350 S.W.3d 338, 352 (Tex. App.–Fort Worth 2011, pet. denied). As with a "material and substantial change in circumstances" required to modify a conservatorship order under section 151.101 of the Family Code, there are no definite guidelines as to what constitutes a "material and substantial change in circumstances" to terminate parental rights under section 161.004. *In re C.A.C.*, No. 14–12–00396–CV, 2012 WL 4465234, at *9 (Tex. App.–

Houston [14th Dist.] Sept. 27, 2012, no pet.) (mem. op.).

### 3. Standard of review

 In reviewing the legal sufficiency of the evidence in a termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *See In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *J.F.C.*, 96 S.W.3d at 266; *C.H.*, 89 S.W.3d at 25. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could have disbelieved. *J.O.A.*, 283 S.W.3d at 344; *J.F.C.*, 96 S.W.3d at 266.

 In reviewing termination findings for factual sufficiency of the evidence, we consider and weigh all the evidence, including disputed or conflicting evidence. *See J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.F.C.*, 96 S.W.3d at 266. We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

### B. Analysis

▇ Father challenges the sufficiency of the evidence to support the jury's findings on the statutory grounds for termination but not the finding that termination is in Adam's best interest. Accordingly, we address only the statutory findings.

### 1. Jury's findings

The jury found that after December 17, 2014, Father engaged in the conduct described in four subsections of section 161.001(b)(1) of the Family Code:

- Subsection F: failed to support the child in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition;
- Subsection N: constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and:
 (i) the Department has made reasonable efforts to return the child to the parent;
 (ii) the parent has not regularly visited or maintained significant contact with the child; and
 (iii) the parent has demonstrated an inability to provide the child with a safe environment; and
- Subsection O: failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

The jury also found that the circumstances of Adam, Father, the Department, or the Hoods had materially and substantially changed since December 17, 2014, and that before December 17, 2014, Father engaged in the conduct described in subsections F, N, and O, as well subsection E of section 161.001(b)(1):

- Subsection E: engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the child.

Only one of these seven findings need be supported by legally and factually sufficient evidence to sustain the termination.

### 2. Predicate ground: Endangerment under section 161.004

Section 161.004 requires proof by clear and convincing evidence that: (1) the petition for termination was filed after the previous denial of termination; (2) there has been a material and substantial change in circumstances since the denial of termination; (3) the parent engaged in conduct described by at least one subsection of section 161.001(b)(1); and (4) termination is in the child's best interest.

It is undisputed that the Hoods filed their petition for termination in January 2016, which is after this court reversed the trial court's December 17, 2014 judgment terminating Father's parental rights with respect to Adam. Furthermore, Father does not challenge the best interest finding. Accordingly, we address only the second and third requirements.

### a. Material and substantial change in circumstances

The party seeking termination must prove a material and substantial change in the circumstances of any of the following: the child, the parent, the sole managing conservator, the possessory conservator, or any other party affected by the order

denying termination. *See* Tex. Fam. Code Ann. § 161.004(a)(2) (West 2014).

We concluded in M.M.'s appeal (section I.B.2) that legally and factually sufficient evidence supports the jury's finding that circumstances had materially and substantially changed. That conclusion applies to Father's appeal also.

### b. Endangerment before December 17, 2014

 Parental rights may be terminated if a parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *S.R.*, 452 S.W.3d at 360.

 The evidence must show the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.–Fort Worth 2003, no pet.). Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A court properly may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.–El Paso 2012, no pet.). While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.–Fort

Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.B.*, 412 S.W.3d 588, 599 (Tex. App.–Fort Worth 2013), *aff'd*, 437 S.W.3d 498 (Tex. 2014).

 *Criminal activity.* Evidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of the child. *S.R.*, 452 S.W.3d at 360–61; *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.–El Paso 2012, no pet.).

The jury received evidence that Father was convicted nine times between 2001 and 2013. Six convictions were for possession of drugs (marijuana or cocaine), one was for attempted unauthorized use of a motor vehicle, one was for assault, and one was for making a terroristic threat. Evidence of these convictions supports a finding of endangerment.

 *Untreated mental illness.* Mental illness alone is not grounds for terminating the parent-child relationship. *S.R.*, 452 S.W.3d at 363. Untreated mental illness can expose a child to endangerment, however, and is a factor the court may consider. *Id.*; *see In re L.L.F.*, No. 02–11–00485–CV, 2012 WL 2923291, *15 (Tex. App.–Fort Worth July 19, 2012, no pet.) (mem. op.) (considering parent's failure to take medication for mental illness as factor in creating environment that endangers child's emotional or physical well-being); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.–Houston [14th Dist.] 2003, no pet.) (considering parent's mental health and noncompliance with medication schedule as factors in endangering child).

Over a span of four years, three of the trial courts in Father's criminal cases or-

dered psychiatric examinations on Father. The stated bases for the orders are:

**2007.** "Defendant has mental health history—will not answer any questions."

**2009.** "The defendant talks about his right to travel and that he is not a citizen of U.S."

**2011.** "The defendant and his attorney are having a difficult time communicating. This defendant does not comprehend the jurisdiction of this court system over him." "Defendant is well spoken, but is not rational. He talks about the dead laws and that he must write with lower case because upper case is for spirits. He says that the law is for the dead, and gets upset when I asked about previous psychiatric treatment. He says he is not crazy and his organization will be known in a month."

The removal affidavits for Adam's older siblings also included information about Father's suspected mental illness and membership in the United Nuwaubian Nation of Moors, described at trial as a cult:

**I.M., November 2010.** A hospital social worker "stated that [Father] had informed her that he did not want any legal documents created for the baby including a birth certificate or medical records. She also provided me with copies, front and back, of two identification cards provided by [Father] to the hospital. The first is labeled 'INDIGENOUS GOVERNMENT ID—TAX EXEMPT' and states that he is an 'Aboriginal MINISTER Choctaw Cherokee Native.' This is the card [Father] subsequently showed to me. The second card is labeled 'International Indigenous Society' and states that he is an 'Aboriginal Cherokee Choctaw Native American.' Both cards list a 'US Dept of State Fed Auth #06013144–1.' Subsequent investigation indicates that these are probably ID cards provided by the group known as 'The Republic of Texas.'"

**Baby Girl, August 2011.** "[Father] stated that the reason he wanted his child to be born at home is because he did not want the government to be able to track his child or make money 'off of his child's energy.' [Father] stated that [Mother] is only a vessel for the child. He believes that the baby is his child and not [Mother's] because it came from his seed. [Father] states that he and [Mother] are property of the [Moors] estates, and that the child is the property of the estate as well.

**Eddie, August 2012.** "During my interview with the parents, they confirmed that they would not provide any written consent for the hospital to administer treatment as this went against their cultural beliefs as members of the United Nuwaubian Nation of Moors. The parents maintain that their Nuwaubian membership also dictates that they could not name their child until nine days after birth. ... When questioned about the parents' prior Child Protective Services (CPS) history concerning their two other children, both the mother and father maintain that they were victimized by the government. The father then advised me that the State of Texas was known to receive up to five million dollars for every child "kidnapped" by CPS. The father then went on to tell me that he and the mother were knowledgeable about the government's plan to silence them by shipping them off to 'concentration camps.' .... The parents could not focus on anything other than explaining their Nuwaubian belief system. The parents are not able to focus on their child's need for care."

The criminal courts' orders and the removal affidavits are evidence that Father has persistent, untreated mental illness. In

addition, there was evidence of Father's communications with McCartney about UFOs and aliens and his claim to be associated with the Rockefeller family. This evidence, together with the evidence of repeated criminal activity, supports the jury's endangerment finding.

## C. Endangerment in First Appeal compared with this appeal

Our holding in this case is not inconsistent with our holding in the First Appeal. Endangerment under subsection E was not a basis for termination in the First Termination Suit. Instead, the trial court found termination was appropriate under subsection D. Subsection D and subsection E both address endangerment of the child. However, subsection D concerns the dangerous conditions in which the parent has placed or left the child, and subsection E concerns the dangerous conduct of the parent. *Compare* Tex. Fam. Code Ann. § 161.001(b)(1)(D) (parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child") *with id.* § 161.001(b)(1)(E) (parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child").

Endangerment under subsection D may be established by evidence of the child's environment. *S.R.*, 452 S.W.3d at 360. "Environment" refers to the acceptability of living conditions, as well as a parent's conduct in the home. *Id.* Under subsection E, the evidence must show the endangerment was the result of the parent's conduct, including acts, omissions, or failure to act. *Id.* A finding of endangerment under subsection D must be based on the child's environment before the Department removed the child. *Id.* A finding of endangerment under subsection E, however-

er, may be based on conduct both before and after removal. *Id.*

In the First Appeal, our review under subsection D was limited to evidence introduced at the trial of the First Termination Suit regarding Adam's conditions before the time of removal. *A.L.H.*, 468 S.W.3d at 746. We held there was no evidence that Father "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(D). We wrote:

> The record reflects the Department introduced no evidence of the actual physical surroundings or conditions of [Adam's] environment prior to his removal. Moreover, the Department did not introduce legally-sufficient evidence that [Father] had knowledge of [Adam's] environment at that time. Although there is some evidence of [Father's] suspected drug use, the record fails to reflect when it occurred or whether it posed a potential danger to [Adam].

*A.L.H.*, 468 S.W.3d at 747. Father's conduct was not at issue, and our holding of insufficient evidence was not based on a lack of evidence of Father's conduct.

In this case, by contrast, Father's conduct is at issue. Our review is of the evidence introduced at the trial of the Consolidated Cases that Father, before or after Adam's removal, "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). As discussed, the evidence is sufficient to support a finding of endangerment under subsection E.

## D. Conclusion on termination

Considering all the evidence in the light most favorable to the finding, we conclude

the jury reasonably could have formed a firm belief or conviction that (1) there had been a material and substantial change in circumstances sufficient to satisfy section 161.004(a)(2), and (2) Father engaged in the conduct described in subsection E of section 161.001(b)(1) before December 17, 2014. See *J.O.A.*, 283 S.W.3d at 344; *J.F.C.*, 96 S.W.3d at 266. Further, any disputed evidence regarding these facts was not so significant that the jury could not reasonably have found the way it did. See *J.F.C.*, 96 S.W.3d at 266. Accordingly, the evidence is legally and factually sufficient to support the jury's answer to question 1 that Father's parental rights should be terminated. We overrule issue 1.

## VIII. Res Judicata and Collateral Estoppel (Issue 5)

Like M.M., Father contends the Hoods' claims are barred by res judicata and collateral estoppel due to the trial court's judgment in the First Termination Suit denying the Hoods' petition for conservatorship. We reject his contention for the reasons set forth in section II.C.3 of this opinion. We overrule issue 5.

## IX. Jury Charge (Issue 4)

Father asserts the trial court erred in submitting questions to the jury raising the issue of a material and substantial change in circumstances without also submitting instructions on res judicata and collateral estoppel as M.M. requested.

■■■ Father has not preserved this issue. He neither objected to the omission of such instruction nor joined in M.M.'s objection. See Tex. R. App. P. 33.1(a)(1); *Dao v. Garcia*, 486 S.W.3d 618, 627 (Tex. App.–Dallas 2016, pet. filed) (party must object to trial court's refusal to submit an instruction in jury charge to preserve error for appellate review). In civil cases, unobjected-to charge error is not reversible unless it is fundamental, which occurs only "in those rare instances in which the record shows the court lacked jurisdiction or that the public interest is directly and adversely affected as that interest is declared in the statutes or the Constitution of Texas." *In re L.D.C.*, 400 S.W.3d 572, 574 (Tex. 2013) (quoting *Pirtle v. Gregory*, 629 S.W.2d 919, 920 (Tex. 1982)). Because the Hoods' claims were not barred by res judicata or collateral estoppel, Father cannot show fundamental error in the trial court's refusal to submit M.M.'s proposed instruction. We overrule issue 4.

## X. Judgment Conforms with Pleadings (Issue 3)

Father contends the trial court lacked discretion to sign a judgment that did not conform to the pleadings. Specifically, he says the judgment terminates his parental rights under section 161.004 of the Family Code but the Hoods did not plead for termination on that basis in their live petition. Texas Rule of Civil Procedure 301 states in relevant part: "The judgment of the court shall conform to the pleadings, the nature of the case proved and the verdict, if any ...." Tex. R. Civ. P. 301.

■■■ Father has not preserved this issue, either. To preserve a complaint of error in the judgment, the party must inform the trial court of its objection by a motion to amend or correct the judgment, a motion for new trial, or some similar method. *Dal–Chrome Co. v. Brenntag Southwest, Inc.*, 183 S.W.3d 133, 144 (Tex. App.–Dallas 2006, no pet.). The trial court held a hearing regarding entry of judgment. M.M. lodged objections to the form of judgment, but Father did not. Although Father later filed a motion for new trial, he did not raise this issue in his motion. See Tex. R. App. P. 33.1(a)(1). Accordingly, Father may not raise this issue on appeal.

We overrule issue 3.

CONCLUSION

We affirm the trial court's judgment.