**Affirmed and Memorandum Opinion filed April 9, 2019.**



In The

# Fourteenth Court of Appeals

### NO. 14-18-00951-CV

## IN THE INTEREST OF A.J.R. A/K/A A.J.R., A CHILD

**On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause No. 2017-04707J**

## M E M O R A N D U M   O P I N I O N

This accelerated appeal arises from a final order in a suit in which termination of the parent-child relationship was at issue. *See* Tex. Fam. Code Ann. § 109.002(a-1). The child is Alex; his parents are L.D.J. (Mother) and appellant A.R. (Father).[1] The trial court terminated each parent's rights and appointed the Texas Department of Family and Protective Services (the Department) to be Alex's managing conservator.

On appeal, Father challenges the sufficiency of the evidence to support

---

[1] We use pseudonyms or initials to refer to the children, parents, and other family members involved in this case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

termination. We conclude legally and factually sufficient evidence supports the trial court's findings that Father endangered Alex and that termination of his parental rights is in Alex's best interest. Therefore, we affirm the trial court's final order.

## BACKGROUND

### A.    Removal

The following facts come from the affidavit of Department caseworker Michael Ejeh, which was admitted into evidence at trial.

Alex was born prematurely at 35 weeks' gestation. Both he and Mother tested positive for amphetamines at his birth. When Alex was 10 days old, the Department received a referral of neglectful supervision of him by Mother. The reporter alleged Mother had been diagnosed with, among other things, bipolar disorder. Mother was also said to suffer from suicidal ideation.

Ejeh visited Alex in the hospital the next day. No family member was with Alex at that time. Ejeh spoke with Mother in the hospital and noticed she had a black eye—an injury she claimed resulted from playing baseball with her nephews but Ejeh later learned may have been the product of an assault by Father. Mother claimed she was prescribed various medications, including an antipsychotic and a stimulant, but could not provide proof of those prescriptions when asked.

Father was not at the hospital when Ejeh visited. Ejeh first spoke with Father two days later. Father said he was from California but had lived in Texas for two years. He said he had two children in California, ages nine and two, both of whom he said lived with their mother. Father denied any history of criminal activity, mental illness, domestic violence, drug use, or being abused as a child. He also alleged he had no history with the Department.

That day, Mother and Father agreed to a Parental Child Safety Plan (PCSP)

with the Department. Under the PCSP, Alex and both parents would move in with Alex's paternal grandmother when he was discharged, and both parents would submit to a drug test. Neither Mother nor Father appeared for the drug test. For various reasons, including reported drug use by the grandmother, the PCSP became unsustainable.

Alex suffered a serious health scare a few days later. His blood had been drawn at a doctor's appointment. After he left, tests run on the blood revealed he suffered from low hemoglobin levels and direly needed a blood transfusion. Clinic staff attempted to contact Mother and Father several times that day but could not reach them. Ejeh eventually tracked the parents down the following day, by which time Alex was said to be at risk of death if he did not receive a blood transfusion immediately. Mother took Alex to the hospital; he was admitted for four days and successfully treated.

Shortly after Mother arrived at the hospital with Alex, Department supervisor Debra Reyna talked with her about implementing another PCSP. Mother rejected the idea, insisting Alex stay with her. In support of her contention she could take care of Alex, Mother offered explanations for her and Father's failures to submit to drug testing as they had agreed and her failure to submit evidence of prescriptions for the psychotropic medications she said she was taking. Reyna offered to conduct a family team meeting with the Department and the parents. Mother agreed and "very much" wanted to have such a meeting to "explain everything going on."

Despite Mother's professed enthusiasm about a family team meeting, neither Mother or Father contacted the Department to schedule the meeting. Neither parent proposed another person for a PCSC. Neither parent visited Alex during his hospital stay. Neither parent was seen after the day Mother took Alex to the hospital.

Alex would need close medical supervision upon discharge, according to his

doctor. Because the Department could not locate Mother or Father, the Department formally removed Alex and placed him in foster care. The Department then filed its petition for protection of a child, conservatorship, and termination, attaching Ejeh's affidavit.

### B.      Pretrial proceedings

Following a full adversary hearing, the trial court found Alex was in such danger due to his parents' acts or failures to act that he needed to be removed from their care immediately for his protection. The court appointed the Department to be Alex's temporary managing conservator and ordered the parents to comply with any family service plan by the Department. The service plan would identify the goals they needed to achieve and tasks and services they needed to complete before Alex could be placed in their care.

Father's service plan required him to, among other things: complete a psychological evaluation and follow the evaluator's recommendations; support Alex, financially and otherwise; complete a substance abuse assessment; complete individual counseling to develop his parenting skills; maintain stable employment and provide the caseworker with appropriate documentation; maintain contact with the Department; and attend all visits with Alex, court dates, and meetings.

### C.      Hearing

Father did not appear at trial; he was in jail in California at the time. He was represented by counsel.

#### 1.      Evidence about Father

##### a.      Drug use

Drug tests conducted immediately after the emergency hearing in this case, at the beginning of October 2017, revealed Father was positive for alcohol, marijuana,

amphetamines, and methamphetamines. His levels for each substance were multiple times higher than the minimum level that will yield a confirmed positive result. For example, the minimum level for a confirmed positive result for methamphetamine is 500 nanograms per milliliter [ng/mL] by urinalysis and 300 picograms per microgram [pg/mg] by hair follicle test. Father's levels were 52,200 ng/mL and greater than 50,000 ng/mg. The two components considered in alcohol testing, ethyl glucuronide and ethyl sulfate, both have a confirmed positive level of 250 ng/mL. Father's levels were 40,100 ng/mL and 6,860 ng/mL, respectively.

Two weeks later, the trial court ordered Father to remain in the courtroom following the full adversary hearing for drug testing. Father left the courtroom without submitting to the test. His leaving is considered a positive drug test result under Department policy. Three more drug tests were scheduled through the end of February 2018, but Father failed to appear for any of them. Like walking out before being tested, failing to appear for a drug test is deemed a positive result.

Father was extradited to California on a theft charge sometime after the scheduled February test. No further drug tests were scheduled for him in this case.

### b. Criminal history

Despite telling Ejeh he had no criminal history, Father was convicted at least twice in Texas. He pleaded guilty to burglary of a vehicle in April 2016 and was sentenced to 120 days' confinement in jail. In April 2018, he pleaded guilty to forgery he committed just days before Alex was born. He was sentenced to serve 180 days in jail for that offense.

Before the criminal court formally accepted his plea in the forgery case, Father was extradited to California to face charges regarding stolen property. The record does not contain further information about the California proceedings, including whether Father was convicted and his punishment if so.

### c.       Service plan

The trial court approved Father's family service plan on November 30, 2017. Father was not extradited until the beginning of March 2018 at the earliest. During that three-month period, Father did not begin any of the requirements of his service plan, much less complete them.

### d.       Ability to provide for Alex

Ejeh wrote in his affidavit that Father told him he works for his stepfather and earns $1,200 per month. Father made that statement near the end of September 2017. There is no other evidence regarding Father's ability to provide for Alex.

### e.       Relationship with Alex

Father never lived with Alex. The record does not indicate whether Father was present for Alex's birth or saw Alex at any time before the Department became involved. Father did not visit Alex during his hospitalization due to low hemoglobin levels.

### 2.       Evidence about Alex

Upon discharge from the hospital following his blood transfusions, Alex was placed in the home of a couple already caring for one of Mother's other children, Alex's then-nine-year-old half-sister. They had been the half-sister's managing conservators for years. If Mother's and Father's parental rights were terminated as to Alex, the foster parents planned to adopt both Alex and his half-sister.

Alex required regular blood transfusions after he was placed with his foster parents. He also needed an iron supplement. The foster parents ensured all his medical needs were met. His last blood transfusion occurred when he was three or four months old.

Just over a year old at the time of the final hearing, Alex was said to be

thriving. His health issues were controlled. He lived with his foster parents, his biological half-sister, and his foster parents' 17-year-old daughter. The foster parents had three other children, all in college. The foster father testified Alex was bonded with the entire family. Caseworker Alexandra Brown testified the Department believed it was in Alex's best interest to remain with his foster family and wholeheartedly endorsed the foster parents' plan to adopt Alex.

### 3. Trial court's findings

The trial court found Mother and Father engaged in the conduct described in subsections D, E, and O of section 161.001(b)(1) of the Family Code. The court additionally found termination of each parent's rights was in Alex's best interest. The trial court appointed the Department to be Alex's managing conservator. Father timely appealed.

ANALYSIS

## I. Burden of proof and standards of review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re J.E.M.M.*, 532 S.W.3d 874, 879 (Tex. App.—Houston [14th Dist.] 2017, no pet.). However, the child's emotional and physical interests must not be sacrificed to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Parental rights can be terminated if clear and convincing evidence shows (1) the parent committed an act described in section 161.001(b)(1) of the Family Code, and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b)(1), (2). Only one predicate finding under section 161.001(b)(1), along with the best-interest determination, is necessary to support termination. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). "'Clear and convincing evidence' means the

measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007. This high burden reflects the severity of termination.

The heightened burden of proof results in heightened standards of review for evidentiary sufficiency:

- *Legal sufficiency.* We consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could disbelieve. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

- *Factual sufficiency.* We consider and weigh all the evidence, including disputed or conflicting evidence, to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We consider whether disputed evidence is such that a reasonable fact finder could not have resolved that dispute in favor of its finding. *C.H.*, 89 S.W.3d at 25.

The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). We may not second-guess the fact finder's resolution of a factual dispute by relying on disputed evidence or evidence the fact finder "could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

## II.     Predicate ground for termination: Endangerment (161.001(b)(1)(E))

Father challenges the legal and factual sufficiency of the evidence to support the trial court's findings under subsections D, E, and O of section 161.001(b)(1) of the Family Code. We conclude the evidence is legally and factually sufficient to support the finding of endangerment under subsection E. Accordingly, we do not review the findings regarding subsections D or O. *A.V.*, 113 S.W.3d at 362.

## A.    Legal standards

Family Code section 161.001(b)(1)(E) requires clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "Conduct" includes acts and failures to act. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

A finding of endangerment requires evidence the endangerment resulted from the parent's conduct. *S.R.*, 452 S.W.3d at 360. Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* at 361. A court properly may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury. Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.L.H.*, 515 S.W.3d 60, 92 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

## B.    Application

***Substance abuse.*** A parent's continuing substance abuse can qualify as a

voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). A parent's drug use exposes the child to the possibility the parent may be impaired or imprisoned and, thus, unable to take care of the child. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The fact finder may give "great weight" to the "significant factor" of drug-related conduct. *L.G.R.*, 498 S.W.3d at 204.

Father tested positive at apparently high levels for methamphetamines, amphetamines, marijuana, and alcohol when this case began a few weeks after Alex was born. Two weeks later, Father defied a court order and refused to submit to another drug test. He failed to appear at any of the three drug tests scheduled for him over the next number of months. Father was deemed to have tested positive for drugs for each refusal to test.

***Criminal activity.*** A parent's criminal conduct and imprisonment are relevant to the question of whether the parent engaged in a course of conduct that endangered the well-being of the child. *S.R.*, 452 S.W.3d at 360–61; *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.). Imprisonment alone is not an endangering course of conduct but is a fact properly considered on the endangerment issue. *Boyd*, 727 S.W.2d at 533–34. Routinely subjecting a child to the probability he will be left alone because his parent is in jail endangers the child's physical and emotional well-being. *S.M.*, 389 S.W.3d at 492.

Father was convicted of burglary of a vehicle roughly 18 months before Alex's birth. Then, just days before Alex was born, Father committed forgery, an offense to which he later pleaded guilty. During the pendency of this case, Father

was extradited to California, where he had allegedly stolen property. The record contains no further information about the California proceeding.

The record in this case is short, and there is not overwhelming evidence of endangering conduct by Father. But there is legally and factually sufficient evidence. Considering all the evidence in the light most favorable to the endangerment finding, we conclude the trial court reasonably could have formed a firm belief or conviction that Father engaged in conduct described in subsection E. Further, in light of the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its endangerment finding is not so significant that the court could not reasonably have formed a firm belief or conviction that Father endangered Alex. Accordingly, the evidence is legally and factually sufficient to support the trial court's finding as to Father regarding subsection E. We overrule Father's first and second issues.

## III.  Best interest

Father challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of his parental rights is in Alex's best interest.

### A.  Legal standards

Termination must be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(2). Texas courts presume two conditions to be in a child's best interest: (1) prompt, permanent placement in a safe environment, *id.* § 263.307(a); and (2) remaining with the child's natural parent. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The best-interest analysis focuses on the child, not the parent. *In re K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.).

Courts may consider these non-exclusive factors, known as the *Holley* factors, in the best-interest analysis: the desires of the child; the physical and emotional needs of the child now and in the future; the physical and emotional danger to the child now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that termination is in the child's best interest. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The Family Code also identifies factors the court may consider in evaluating a parent's willingness and ability to provide the child with a safe environment. Tex. Fam. Code Ann. § 263.307(b). Finally, evidence supporting the statutory predicate of termination is relevant to the best-interest analysis. *S.R.*, 452 S.W.3d at 366.

## B. Application

### 1. Alex's desires and needs

When a child is too young to express his desires, the fact finder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent. *L.G.R.*, 498 S.W.3d at 205; *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Alex was less than a month old when the Department became involved in his life. Apart from the few weeks he spent in the hospital and the few days he stayed with his maternal grandmother, Alex has lived his entire life with his foster parents. He never lived with Father. Just over one year old at the time of trial, Alex was thriving and well-

bonded with his foster family.

### 2. Stability of proposed placement

Both the Department and the foster parents believed it is in Alex's best interest to remain in his foster home so (1) he can be with his older half-sister, and (2) he can enjoy permanency by being adopted.

### 3. Predicate ground of endangerment

Evidence supporting termination under the grounds listed in section 161.001(b)(1) can be considered in support of a finding that termination is in the child's best interest. *See C.H.*, 89 S.W.3d at 27 (holding the same evidence may be probative of both section 161.001(b)(1) grounds and best interest). Accordingly, the evidence of Father's endangerment of Alex, discussed above, is relevant to the best-interest analysis.

### 4. Service plan

Father did not begin, much less complete, any of the requirements of his court-ordered family service plan.

### 5. Willingness and ability to parent

The record is silent regarding Father's involvement with Mother while she was pregnant with Alex. Though not clear, the record implies Father was not present for Alex's birth and did not see him before the Department received the referral regarding Alex a few weeks later. Father did not visit Alex during his hospitalization for blood transfusions. The facts support an inference that Father is unwilling to parent Alex.

The effect of Father's incarceration in California on his ability to parent is not clear. There is no evidence about, for example, the range of punishment Father faces; whether trial has occurred; whether Father has been convicted; and the length of his

sentence, if any.

### 6. Programs available

There is no evidence regarding programs available to assist Father in parenting Alex.

### 7. Acts or omissions and any excuses for them

There is no evidence purporting to explain Father's positive drug test results or his refusals to submit to scheduled drug tests.

### C. Conclusion on best interest

Considering all the evidence in the light most favorable to the best-interest finding, we conclude the trial court reasonably could have formed a firm belief or conviction that termination of Father's parental rights is in Alex's best interest. *See J.O.A.*, 283 S.W.3d at 344; *J.F.C.*, 96 S.W.3d at 266; *C.H.*, 89 S.W.3d at 25. Further, in light of the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its best-interest finding is not so significant that the court could not reasonably have formed a firm belief or conviction that termination of Father's rights is in Alex's best interest. Accordingly, the evidence is legally and factually sufficient to support the trial court's finding that termination is in Alex's best interest. We overrule Father's third issue.

### CONCLUSION

We affirm the trial court's final order of termination.


/s/     Jerry Zimmerer
Justice

Panel consists of Justices Wise, Zimmerer, and Spain.