

# NUMBER 13-25-00271-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF M.R., L.R., E.R., H.R., V.R., CHILDREN

## ON APPEAL FROM THE COUNTY COURT AT LAW NO. 5
## OF NUECES COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices West and Fonseca**
**Memorandum Opinion by Justice West**

Appellant M.S. (Mother) appeals a judgment terminating her parental rights to her children Matt, Lee, Ella, Hope, and Violet.[1] By two issues, Mother argues that there was insufficient evidence that (1) a material and substantial change in circumstances occurred after the trial court initially denied the State's request to terminate her parental rights, and (2) termination was in the children's best interest. We affirm.

---

[1] To protect the identity of minor children in an appeal from an order terminating parental rights, parents and children are referred to by aliases. *See* TEX. FAM. CODE ANN. § 109.002(d).

# I. BACKGROUND

The Department of Family and Protective Services (the Department) filed a petition to terminate Mother's and B.B. III's (Father) parental rights. According to the affidavit in support of removal, the Department received a report that Mother had given birth to Violet in her car on the way to the hospital.[2] It was reported that Violet was positive for a bacterial infection, and Mother may not have received prenatal care during her pregnancy. The family had been evicted twice in the past sixth months, and Mother, Father, Matt, Lee, Ella, and Hope were living with their paternal grandmother in a one-bedroom mobile home at the time of removal. All five children were five years old or younger.

On January 10, 2023, the children were observed by a Department caseworker to be "very dirty," with "very grimy fingernails and toenails and a strong body odor as if they had not been bathed." Three of the children's diapers were "very full and had dirt inside the diaper[s] as if they had not been changed for a significant amount of time." The children were sleeping on the floor of the home, and Hope, who was eleven months old, did not appear to have a safe place to sleep.

While the Department caseworker was at the residence, an altercation between Mother and Father broke out. Father was arrested, and the paternal grandmother "questioned law enforcement why [Mother] was not getting arrested and mentioned that [Mother] hit her son, [Father], first." The grandmother "was visibly upset at [Mother]" and would not let Mother and the children remain in her home. Mother contended that she had a home in Corpus Christi to take the children to; however, she admitted she had not

---

[2] The affidavit in support of removal was introduced as evidence at the subsequent bench trial in March 2025.

signed the lease for the home and there were no working utilities. Despite the Department's attempts to relocate Mother and the children, Mother still wanted "to move into this home." The children were then exigently removed from their parent's care. The affidavit indicated that Father was charged for assaulting Mother but had no other criminal history, and Mother had no criminal history.

The affidavit detailed Mother's and Father's extensive history with the Department. Most significantly, in June 2020, Mother was validated for neglectful supervision after their child Bob drowned in the bathtub. Matt and Lee, the only other children born at the time, were removed from their parents' care. The boys were returned to their care on August 4, 2021, against Department recommendation. Mother and Father successfully completed parenting classes; however, the Department was concerned "that they did not comprehend the information being provided." The Department received four other reports regarding the children in this case, but those investigations were closed, or the allegations were ruled out.

On June 20, 2024, the trial court rendered its final order designating the Department as the children's permanent managing conservator and denying the Department's request for termination of Mother's and Father's parental rights.[3] After the trial court issued its June order, the Department filed a "Request for Change of Placement" and a "Request to Suspend Visitations" in November and December 2024, respectively. The trial court granted both requests.

---

[3] The trial court's order states that the case was "heard and rendered" on June 20, 2024, but the order was signed on December 4, 2024. Neither party disputes that the order was rendered or effective June 20, 2024.

In January 2025, the Department filed a petition to modify the trial court's June 2024 order and requested termination of both parents' parental rights. The trial court held a bench trial on March 12, 2025, and April 7, 2025. At the time of trial, Matt was seven, Lee was five, Ella was four, Hope was three, and Violet was two.

Beatriz Mendez, a Department caseworker, worked on this case from May 2024 to December 2024. Mendez testified that Mother and Father had a family plan of service in place. The trial court granted an extension from the original dismissal date of January 15, 2024, to give the parents more time to complete services. *See* TEX. FAM. CODE ANN. § 263.401. By the time of trial, Mother had "completed several elements of her service plan" including parenting and domestic violence classes, and Mother maintained steady employment throughout the case. However, Mother had not completed her mental health counseling or maintained steady housing. Mendez was also concerned that Mother was unable to demonstrate what she learned from her services because she was "not able to describe what she's learning."

Mendez stated that the Department's remaining concerns for Mother were her depression, which was supposed to be managed by her mental health counseling, and her unstable living situation. Mendez testified that Mother's "depression just stop[s] everything for her," and it impacts her "motivation." Mendez stated that Mother was evaluated by a mental health professional and "given a treatment plan to meet with her therapist to discuss the depression and how to help her cope." However, Mother did not attend any further sessions with her therapist after her initial appointment.

As to the family's living situation, Mendez was not sure if Mother and Father were still together, as they had broken up multiple times throughout the case. She did not know

where Mother lived, and no evidence was introduced as to Mother's current living situation. She estimated that Mother and Father lived in at least five different residences during the case. According to Mendez, the last place Mother lived was her aunt's one-bedroom apartment, which already had "about thirteen people" living there. Mendez believed that Mother and Father were not "ready to have five children added to their daily lives." She went on to state "that [she] strongly believe[s] that [Mother] might be able to care for one child, but a total of six[4], [was] setting up this family for failure."

Mendez testified that lack of attendance at visitation from both parents was an issue throughout her time on the case, but they continued to miss more visitations after June. She stated:

> When I started in May of 2024, there was a total of five no-shows and then two visits that were virtually attended. In June, there was four no-shows. There w[ere] two visits attended virtually. July, there w[ere] five no-shows. Three visits virtually were attended. In August, there was a total of eight no-shows and one visit virtually attended. September 2024, also, eight no-shows and then one visit attended. October of 2024 it was ten no-shows and just one virtual attended. And, then, in November, there w[ere] no-shows to [all] of the visits.

She confirmed that the trial court suspended Mother's and Father's visitation in December 2024 due to their missed visits.

Mendez acknowledged that Mother had issues with transportation, and the Department tried to help Mother make Saturday visitations with the children by providing transportation. She testified that Mother often failed to confirm her availability and visitation "wouldn't happen." Violet's foster mother testified that she kept logs of the parental visits with the children as a group and visits with just Violet. She estimated that

---

[4] During the pendency of the case, Mother and Father had another child, Jack, who remained in their care at the time of trial and is not the subject of this suit or appeal.

5

Mother and Father attended less than fifteen percent of the scheduled visits with the children. She explained that the Department caseworker before Mendez provided Mother and Father with transportation "several times," "but they just wouldn't confirm or they wouldn't attend."

When asked what had changed since June 2024, Mendez stated that Matt, Lee, and Ella had changed foster homes and schools, and visitation from Mother and Father had stopped. Mendez concluded that she believes it is not in the children's best interest to be returned to their parents' care.

Court Appointed Special Advocate (CASA) volunteer, Janet Laylor, testified that she observed all five children multiple times since she started on the case in December 2023. She testified that the children are currently in three separate placements: Matt, Lee, and Ella are all in a foster home together, and Hope and Violet are each in a different foster home. She testified that the three foster families are fantastic and loving, and they are working to address the children's specific needs. She had no concerns with the current foster home placements. The foster homes are prepared for long-term fostering, except for Violet's, whose foster parents intend to adopt her. While Laylor had concerns for the children's stability when they will eventually move out of their foster homes, she did not believe it was in the children's best interests to be reunited with Mother and Father.

The trial court granted the State's request for modification and terminated Mother's and Father's parental rights to the children. The trial court signed an order terminating Mother's parental rights pursuant to Texas Family Code § 161.001(b)(1)(D), (E), (N), and (O). The trial court further found that termination of Mother's and Father's parental rights

was in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). This appeal followed.

## II. DISCUSSION

### A. Standard of Review & Applicable Law

Because of the fundamental rights at issue, due process requires that parental termination be supported by clear and convincing evidence. *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).

In parental termination cases, our legal and factual sufficiency standards honor this elevated burden of proof while respecting the factfinder's role. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018) (citing *In re J.F.C.*, 96 S.W.3d at 264). "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*. In a legal sufficiency review, we "cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *Id*. at 630–31 (citing *In re J.F.C.*, 96 S.W.3d at 266). Thus, "[e]vidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631 (citing *In re J.F.C.*, 96 S.W.3d at 266).

Factual sufficiency, on the other hand, requires us to weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *Id.* We "must consider

whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006)). Therefore, "[e]vidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* (citing *In re J.F.C.*, 96 S.W.3d at 266).

Before parental rights may be involuntarily terminated, the trier of fact must find two elements by clear and convincing evidence: (1) that the parent committed one of the statutory grounds for termination found in § 161.001(b)(1) of the family code; and (2) that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). When, as here, the trial court previously denied termination, a trial court may later terminate the parent-child relationship if:

(1)     the petition under this section is filed after the date the order denying termination was rendered;

(2)     the circumstances of the child, parent, sole managing conservator, possessory conservator, or other party affected by the order denying termination have materially and substantially changed since the date that the order was rendered;

(3)     the parent committed an act listed under [§] 161.001 before the date the order denying termination was rendered; and

(4)     termination is in the best interest of the child.

TEX. FAM. CODE ANN. § 161.004(a).

## B.     Material and Substantial Change in Circumstances

Mother first argues that there is legally and factually insufficient evidence that a material and substantial change occurred in "the circumstances of the child, parent, sole managing conservator, possessory conservator, or other party" after the June 2024 order.

8

*See id.* § 161.004(a)(2). She argues that the trial court considered substantially similar evidence when it declined to terminate Mother's parental rights in June 2024, and, therefore, the trial court could not have reasonably concluded that a material change in circumstances occurred in the 2025 bench trial. For example, Mother failed to complete her mental health services or maintain steady housing when the trial court denied termination in June 2024.

There are no definite guidelines as to what constitutes a material and substantial change in circumstances under § 161.004. *In re F.M.E.A.F.*, 572 S.W.3d 716, 725 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (quoting *In re A.L.H.*, 515 S.W.3d 60, 89 (Tex. App.—Houston [14th Dist.] 2017, pet. denied)). However, courts have held that a material and substantial change in circumstances exists when a parent fails to complete their family service plan and otherwise cannot provide a stable environment for the child, even where they failed to complete services and were unstable prior to the order denying termination. *See id.* at 725–26 (holding that Mother's continued failure to comply with the provisions of her family service plan supported the finding of a material and substantial change); *see also In re K.C.F.*, No. 05-22-00509-CV, 2022 WL 6353084, at *5 (Tex. App.—Dallas Oct. 10, 2022, no pet.) (mem. op.) (holding that Mother's continued failure to comply with family plan of service and the fact that her "life remain[ed] unstable" supported the finding of a material and substantial change); *In re M.J.W.*, No. 14-16-00276-CV, 2016 WL 4206046, at *8 (Tex. App.—Houston [14th Dist.] Aug. 9, 2016, pet. denied) (mem. op.) (same); *In re J.R.*, No. 07-12-00003-CV, 2012 WL 1605738, at *5 (Tex. App.—Amarillo May 8, 2012, no pet.) (mem. op.) (holding that the appellants' "continued instability," failure to complete services, and "sporadic, infrequent visits with

9

the girls" was sufficient to support finding that there was a material and substantial change in circumstances).

Courts have also held that a material and substantial change in circumstances exists when there has been a change in the child's placement. *See In re A.L.H.*, 515 S.W.3d at 81; *In re N.R.T.*, 338 S.W.3d 667, 679 (Tex. App.—Amarillo 2011, no pet.) (holding that the failure of a home study for the potential placement of the child was sufficient to support a finding of a substantial change in circumstances); *see also In re K.C.F.*, 2022 WL 6353084, at *5 ("Courts have determined that material and substantial changes have occurred when a parent has failed to complete a family service plan or when permanent adoption has been sought.").

Here, the most obvious changes in circumstances since the trial court's initial order were: (1) the suspension of Mother's visitation rights because she began to increasingly miss more scheduled visitations between June and December 2024; and (2) Matt, Lee, and Ella moved to a new foster home placement. *See In re A.L.H.*, 515 S.W.3d at 81; *In re N.R.T.*, 338 S.W.3d at 679; *see also In re K.C.F.*, 2022 WL 6353084, at *5; *In re J.R.*, 2012 WL 1605738, at *5. The trial court could have also considered Mother's continued failure to complete her family plan of service and general lack of stability, including failing to maintain consistent housing and complete her mental health counseling. *See In re F.M.E.A.F.*, 572 S.W.3d at 725–26; *see also In re K.C.F.*, 2022 WL 6353084, at *5; *In re M.J.W.*, 2016 WL 4206046, at *8; *In re J.R.*, 2012 WL 1605738, at *5.

We conclude that there was sufficient evidence to support the trial court's finding that a material and substantial change in circumstances occurred after its initial order denying termination. *See In re F.M.E.A.F.*, 572 S.W.3d at 725–26; *In re N.R.T.*, 338

10

S.W.3d at 679; *see also In re K.C.F.*, 2022 WL 6353084, at *5; *In re M.J.W.*, 2016 WL 4206046, at *8 (holding that the appellant's failure to complete the family plan of service by failing to visit the child and attend medical appointments was sufficient to support finding that there was a material and substantial change in circumstances); *In re J.R.*, 2012 WL 1605738, at *5. Mother's first issue is overruled.

## C.  Best Interest Finding

In Mother's second issue, she argues there is legally and factually insufficient evidence to support the trial court's best interest finding.

There is a strong, though rebuttable, presumption that keeping a child with a parent is in the child's best interest. TEX. FAM. CODE ANN. § 153.131(b); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In reviewing a best interest finding, we consider the non-exclusive *Holley* factors. *In re E.N.C.*, 384 S.W.3d at 807 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). These factors include: (1) the child's desires; (2) the child's emotional and physical needs now and in the future; (3) any emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Id.* The party seeking termination is not required to prove all nine *Holley* factors, and, in some cases, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d 17, 25, 27 (Tex. 2002).

As to the first *Holley* factor, the factfinder may consider whether the child has bonded with the foster family, is well cared for by them, and has spent minimal time with her biological parent. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also In re F.L.B.*, No. 13-19-00319-CV, 2019 WL 6606159, at *10 (Tex. App.—Corpus Christi–Edinburg Dec. 5, 2019, no pet.) (mem. op.). Mendez's and Laylor's testimony indicated that Hope and Violet had bonded with their foster placements. Mendez testified that Violet, specifically, did not have a bond with Mother because she does not know who she is. Some evidence showed that the three oldest children, Matt, Lee, and Ella, initially expressed a desire in January 2023 and 2024 to reunify with their parents. However, the trial court could have considered the evidence that Mother missed many of her scheduled visitations with the children and had not seen the children for at least four months prior to trial. *See In re J.D.*, 436 S.W.3d at 118. And, "[a]lthough a child's love of his natural parents is a very important consideration in determining the best interests of the child, it cannot override or outweigh" overwhelming or undisputed "evidence showing that the parents placed or allowed the child to remain in conditions, [or] engaged in conduct . . . which endangers the physical and emotional well-being of the child." *In re W.S.M.*, 107 S.W.3d 772, 773 (Tex. App.—Texarkana 2003, no pet.); *see In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied). This factor weighs in favor of termination.

As to the second, third and fourth *Holley* factors, Mendez testified that the children need stability, therapy, and consistent schooling. She specified that Matt had emotional attachment issues and was severely behind in school, and Hope was diagnosed with autism and required occupational, physical, and speech therapy. The trial court heard

12

testimony that all the children's current needs were being met in their foster placements, and there was no evidence that the foster families present a current or future risk of emotional or physical damage to the children. Mother introduced no testimony or evidence as to how she would support the children's current and future emotional, developmental, and physical needs. Mother had no plans to provide the children with stable housing, and there was evidence that Mother was not addressing her mental health issues. These factors weigh in favor of termination.

The fifth *Holley* factor addresses programs available to assist individuals seeking custody. While Mother completed many of her services, Mendez testified that she had concerns that Mother was unable to demonstrate what she learned. The trial court also heard evidence that Mendez and the caseworker before her tried to help Mother complete the remaining requirements under the plan, including finding stable housing, obtaining therapy to help her manage her depression, and providing transportation to visit the children, but Mother was unwilling or unable to successfully comply. This factor weighs in favor of termination.

As to the sixth and seventh *Holley* factors, the Department presented evidence that the foster placements were stable and loving environments for the children, and the foster families were prepared for long-term foster care or adoption.

Lastly, as to the eighth and ninth *Holley* factors, in addition to the evidence and concerns above, the record shows that Mother has an extensive history with the Department. The trial court heard evidence that Mother was validated for neglectful supervision when her child, Bob, drowned in a bathtub. And while some evidence showed that Mother's transportation issues prevented her, at least in part, from visitations with the

children, Mother offered no excuse for her failures to find stable housing or address her mental health issues.

Looking at all of the evidence in the light most favorable to the trial court's finding, we conclude a reasonable trier of fact could have formed a firm belief or conviction that termination was in the children's best interests. *See In re A.C.*, 560 S.W.3d at 630. Further, the evidence to the contrary was not so significant as to preclude such a finding. *See id.* at 631. We overrule Mother's second issue.

### III.   CONCLUSION

The trial court's judgment is affirmed.

JON WEST
Justice

Delivered and filed on the
25th day of September, 2025.

14